IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| SUCRE G. FIGUEREO-MEJIA, ) | | |
|     Plaintiff, ) | Civil Action No. 7:18-cv-00286 | |
| ) | | |
| v. ) | MEMORANDUM OPINION | |
| ) | | |
| BENJAMIN LOKEY, et al., ) | By: | Joel C. Hoppe |
|     Defendants. ) | | United States Magistrate Judge |

Plaintiff Sucre G. Figuereo-Mejia, a Virginia prisoner appearing pro se, filed this action under 42 U.S.C. § 1983, alleging that six correctional officials violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Compl., ECF No. 1. Defendants filed a motion for summary judgment on all claims, ECF No. 21, which has been fully briefed, ECF Nos. 22, 26. The motion will be granted in part and judgment entered in the individual Defendants' favor. Figuereo-Mejia's claim for retrospective injunctive relief will be dismissed without prejudice.

I. Standard of Review

"[T]he relevant inquiry" at summary judgment "is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Gordon v. Schilling*, --- F.3d ---, --- (4th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," *Appalachian Power Co. v. Arthur*, 39 F. Supp. 3d 790, 796 (W.D. Va. 2014), by "pointing out to the district court . . . an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the party makes that showing, the nonmoving party

1

must then produce admissible evidence showing a specific material fact genuinely in dispute.[1]

Fed. R. Civ. P. 56(c), (e); *see Scott v. Harris*, 550 U.S. 372, 380 (2007); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Facts are "material" when they "might affect the outcome of the suit under the governing law," and a "genuine" dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A court making this determination does not weigh evidence, consider credibility, or resolve disputed issues—it decides only whether the facts and reasonable inferences drawn therefrom, viewed in the light most favorable to the nonmoving party, reveal a genuine dispute of material fact for trial. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

## II. Background

This is a prison discipline case. It started on August 1, 2016, when Defendants M. Slagle and T. Gideos searched Figuereo-Mejia's cell at Augusta Correctional Center ("ACC"). Compl. 2–3.[2] Slagle "found an oatmeal box with 11 individually wrapped and 2 unwrapped unknown

---

[1] Because Figuereo-Mejia is a lay person representing himself, he enjoys "the benefit of a liberally construed complaint," *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), that "must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "principles requiring generous construction of *pro se* complaints are not . . . without limits." *Beaudett*, 775 F.2d at 1278. For example, the Fourth Circuit has explained that while "*pro se* litigants cannot . . . be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly presented to them." *Id.* at 1276. "Applying these principles to the summary judgment context, a *pro se* plaintiff must comply with Rule 56 of the Federal Rules of Civil Procedure and come forward with sufficient evidence upon which a reasonable jury could return a verdict in his or her favor." *Reid v. Charlotte-Mecklenburg Bd. of Educ.*, No. 3:14cv66, 2016 WL 6080545, at *4 (W.D.N.C. Feb. 12, 2016). "Mere unsupported speculation is not sufficient to defeat a [properly supported] summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." *Conyers v. Va. Hous. Dev. Auth.*, 927 F. Supp. 2d 285, 291 (E.D. Va. 2013) (quoting *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006)).

[2] Pinpoint citations to documents filed electronically in this Court use the footer page numbers generated by CM/ECF and the exhibit labels assigned by the filing party.

sticky substances." *Id.* at 3. Figuereo-Mejia explained they were "coffee shots . . . from [a] yellow bag of coffee sitting on the desk" in his cell. Compl. Ex. 26, Aff. of S. Figuereo-Mejia ¶ 2 (June 12, 2018), ECF No. 1-1, at 41. When Slagle asked why "'it look[ed] like that,'" Figuereo-Mejia said he thought "the moisture in the cell ma[de] the coffee stick together." *Id.* Slagle confiscated the box's contents. *Id.* ¶ 3; *see* Compl. Ex. 2, ECF No. 1-1, at 3–4.

Two hours later, Figuereo-Mejia was escorted to a meeting with Defendant Benjamin Lokey, an ACC's Institutional Investigator. Figuereo-Mejia Aff. ¶ 4; *see* Compl. 3; Defs.' Br. in Supp. Ex. 1, Aff. of B. Lokey ¶ 1 (Feb. 25, 2019), ECF No. 22-1. Lokey read Figuereo-Mejia his *Miranda* rights before asking him about the suspicious substance. Figuereo-Mejia Aff. ¶ 4. He "told him that it was just coffee." *Id.* Figuereo-Mejia recalled Lokey saying that he

> conducted a [f]ield [t]est on the coffee and it showed positive for amphetamines. He also told [Figuereo-Mejia] that [he] better tell him what it was and where [he] got it from because [Lokey] was going to find out anyways by sending it to the lab. . . . Lokey insisted that the coffee was a drug even though [Figuereo-Mejia] told him that it was just coffee.

*Id.* ¶¶ 6, 8. Figuereo-Mejia was immediately moved to administrative segregation. *Id.* ¶ 8; Compl. 3–4; Compl. Ex. 1, ECF No. 1-1, at 3. On August 2, he received a Disciplinary Offense Report charging him with "Possession of Unauthorized or Un-prescribed Drugs" in violation of prison policy. Figuereo-Mejia Aff. ¶ 8; *see* Compl. Ex. 2, at 4–5. The charge was based on Slagle's report that "Lokey arrived and field tested the substance," which "tested positive for amphetamines." Compl. Ex. 2, at 4–5.

The next day, Figuereo-Mejia submitted a Witness Request Form asking Lokey, Gideos, and three inmates to provide statements about the incident. Compl. Ex. 3, ECF No. 1-1, at 8. Defendant T. Hostetter granted Figuereo-Mejia's request for the two staff witnesses, but she denied his request for inmate statements attesting that the "found substance is just coffee." *Id.*

3

Gideos recalled the substance "smelled like coffee and was sticky." Compl. Ex. 4, ECF No. 1-1, at 9. Lokey stated that on August 1, 2016, he "tested the [b]lack tar substance" and the "[f]ield test showed positive for [a]mphetamine." Compl. Ex. 5, ECF No. 1-1, at 10. Lokey had asked Figuereo-Mejia "why it was packaged like it was," to which Figuereo-Mejia responded, "that's just [his] routine." *Id.* (spelling and punctuation corrected). According to Lokey, Figuereo-Mejia was "unable to tell [Lokey] anything about the substance or where [he] got it." *Id.*

Hostetter held a formal disciplinary hearing on August 15, 2016. *See* Defs.' Br. in Supp. Ex. 2, Aff. of T. Hostetter ¶ 8 (Feb. 25, 2019), ECF No. 22-2, at 3. Figuereo-Mejia, Lokey, and Slagle testified at the hearing. *Id.* Lokey provided a photograph of the confiscated packets, Figuereo-Mejia Aff. ¶ 13; *see* Defs.' Br. in Supp. Ex. 2, at 49, but "no pictures [were] taken of the field test" or its results. Hostetter Aff. ¶ 8. Hostetter denied Figuereo-Mejia's request that Lokey produce "a copy of the [f]ield [t]est . . . show[ing] that the substance found tested positive for amphetamines," Figuereo-Mejia Aff. ¶ 13, because that information "was restricted for offender access," Hostetter Aff. ¶ 8. *See* Compl. Ex. 6, ECF No. 1-1, at 11.

Hostetter found Figuereo-Mejia guilty of possessing unauthorized drugs based on Slagle's and Lokey's "eye witness testimony" that the substance "field tested . . . positive for amphetamine," along with Figuereo-Mejia's admission that the substance belonged to him. Compl. Ex. 2, at 6. She rejected Figuereo-Mejia's testimony that it "was coffee[,] not amphetamine," because he "produced no evidence" that either corroborated this alternative explanation or contradicted "the positive field test or the reporting officer's testimony." *Id.* Hostetter sentenced Figuereo-Mejia to thirty days in segregation plus "[n]on-contact visits with immediate family only for six months." *Id.* Figuereo-Mejia returned to ACC's general population on September 8, 2016. *See* Compl. 11 (citing Compl. Ex. 19, ECF No. 1-1, at 26). Defendants

John Woodson and Marcus Elam later upheld the disciplinary conviction on appeal. Compl. Exs. 11 to 14, ECF No. 1-1, at 17–21.

In late August, ACC's Institutional Classification Authority ("ICA") increased Figuereo-Mejia's security level and recommended that he be transferred to a more secure facility. *See* Compl. 7. The ICA also reduced Figuereo-Mejia's "Good Time Level," which extended his "projected release date from 09/08/2026 . . . to 01/24/2028." *Id.*; *see id.* at 21. Both adjustments were based on the drug conviction. *See id.* at 7. Around the same time, Figuereo-Mejia filed an informal complaint asking whether "the coffee that was found in [his] cell . . . [was] sent to the lab for an analysis," and, if so, "what [was] going on with it." Compl. Ex. 15, ECF No. 1-1, at 22 (emphasis omitted). An ACC officer responded that "[it] takes 6 to 9 months for the results to come back." *Id.* at 22–23. Woodson provided the same estimate in response to Figuereo-Mejia's regular grievance. Compl. Ex. 17, ECF No. 1-1, at 24.

Someone sent the field test's results to Virginia's State Consolidated Laboratory "to be validated," as is required before the Commonwealth can file criminal charges against a prisoner. Lokey Aff. ¶ 4. The "verified" results showed that the substance "was coffee, and not amphetamines." *Id.* ¶ 5. Lokey "immediately notified" ACC's Operations Manager, *id.*, who relayed the news to Figuereo-Mejia on June 9, 2017, *see* Compl. Ex. 23, ECF No. 1-1, at 37. On June 29, Woodson overturned the conviction "based on information received from . . . Lokey that the substance was not unauthorized or unprescribed." Compl. Ex. 24, ECF No. 1-1, at 38. A few weeks later, Figuereo-Mejia's "good time earning level was adjusted from Class Level IV to Class Level I (the highest earning level) for the period of August 3, 2016, through his next annual review of May 31, 2017." Defs.' Br. in Supp. Ex. 3, Aff. of T. Lawhorn ¶ 4 (Feb. 21, 2019), ECF No. 22-3; *see* Defs.' Br. in Supp. Ex. 3, at 3. The correction restored Figuereo-

Mejia's earning level to where it was immediately before he was moved to pre-hearing detention. *See* Defs.' Br. in Supp. Ex. 3, at 3.

*

Figuereo-Mejia filed this § 1983 action in June 2018. His "essential grievance," *Beaudett*, 775 F.2d at 1278, is that Lokey "never actually" field tested the coffee and lied about it "test[ing] positive for amphetamines," Compl. 13, 19. *See also* Compl. 3, 7, 18, 21; Figuereo-Mejia Aff. ¶ 13. This triggered a "domino effect," Compl. 23, causing Slagle and Gideos to "falsely" accuse Figuereo-Mejia of possessing unauthorized drugs, *see id.* at 4–5, 18, and Hostetter to convict him of that infraction even though Lokey did not produce any tangible evidence corroborating his testimony, Figuereo-Mejia Aff. ¶ 13. Woodson and Elam knew about these problems when they denied Figuereo-Mejia's disciplinary appeals and related grievances. Compl. 19.

"This whole incident was traumatizing to [Figuereo-Mejia] because of how it all happened" and the stress it caused his friends and family. Figuereo-Mejia Aff. ¶ 17; *see id.* ¶¶ 9–10, 14–16. He suffered "[m]ental [h]ealth issues" in isolation and asked for counseling. Compl. 6, 11–12. His (now former) fiancé won full custody of their children based on "the false notion that he was engaged in illegal activity which caused his visitation to be suspended for six (6) months." *Id.* at 13–14; *see* Figuereo-Mejia Aff. ¶ 18. He "lost friendships" and feared he would never have a chance "to clear up [his] name" in prison. Figuereo-Mejia Aff. ¶ 15. "After 9 months of challenging the validity of the [f]ield [t]est and requesting a [l]ab [t]est, the substance finally came back from the lab showing that [it] was in fact coffee and not amphetamines." *Id.* at 18–19 (emphasis omitted). Figuereo-Mejia believes the "proper procedure for such a charge would have been to either do an actual [f]ield [t]est (which [he] believes was never done, as there has been no test produced) or to place him under investigation, send the coffee off to a lab," and wait for the official results. *Id.* at 21; *see id.* at 18. If the coffee tested positive for amphetamines,

6

then he "could have been charged and kept in segregation." *Id.* at 21. Figuereo-Mejia seeks nominal, compensatory, and punitive damages against Defendants in their individual capacities. Compl. 23; *see id.* at 15–19 (Eighth Amendment), 19–22 (Due Process); Pl.'s Br. in Opp'n 1, ECF No. 26. He also seeks injunctive relief "in the form of . . . Lokey suffering the loss of his job" for his role in this ordeal. Compl. 23.

III. Analysis

A § 1983 claim has two basic elements: "[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The facts material to a § 1983 claim will depend on the specific federal right at issue, *see Iqbal v. Ashcroft*, 556 U.S. 662, 677 (2009); *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *Loftus v. Bobzien*, 848 F.3d 278, 285 (4th Cir. 2017), the capacity in which the plaintiff sued the named defendant, *Kentucky v. Graham*, 473 U.S. 159, 165–68 (1985); and, relatedly, the nature of relief sought against that defendant, *Biggs v. Meadows*, 66 F.3d 56, 60–61 (4th Cir. 1995). *See, e.g.*, *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief.").

A.  *Official Capacity Claim*

Private plaintiffs typically cannot sue a State or its agencies in federal court. *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 253–54 (2011). An official-capacity claim under § 1983 "generally represents . . . another way of pleading an action" against the state entity that employs the official whose alleged misconduct violated the plaintiff's constitutional rights. *Graham*, 473 U.S. at 166. "As long as the government . . . receives notice and an opportunity to

respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* The law is clear, however, that "individuals sued in their official capacity as state agents cannot be held liable for damages or retrospective injunctive relief. They may [only] be sued for prospective injunctive relief to end violations of federal law and remedy the situation for the future." *Lewis v. Bd. of Educ. of Talbot Cty.*, 262 F. Supp. 2d 608, 612 (D. Md. 2003) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)).

Figuereo-Mejia's request that Lokey "suffer[] the loss of his job," Compl. 21, is barred because the Complaint does not *both* "allege[] an ongoing violation of federal law *and* seek[] relief properly characterized as prospective," *Stewart*, 563 U.S. at 257 (emphasis added). On the contrary, Lokey's alleged misconduct "occurred entirely in the past," *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999), and ended nearly two years before Figuereo-Mejia filed this lawsuit. Accordingly, his claim for retrospective injunctive relief against Lokey in his official capacity will be dismissed without prejudice. *See In re Sec'y of Dep't of Crime Control & Public Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993).

B. *Individual Capacity Claims*

Figuereo-Mejia's other claims "seek to impose personal liability upon," and recover money from, Defendants for actions they took under color of state law, *Graham*, 473 U.S. at 165. *See* Compl. 1–2, 23. "[T]here is no respondeat superior liability in § 1983 actions," *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004), so Figuereo-Mejia must adduce facts showing that "each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see* Defs.' Br. in Supp. 8–12. Additionally, because each Defendant has invoked qualified immunity, Defs.' Br. in Supp. 21–23, Figuereo-Mejia must point to facts in evidence that, when "taken in the light most favorable to [him as] the party

asserting the injury, show the [Defendant's] conduct violated a federal right" that "was clearly established at the time of the violation." *Tolan*, 572 U.S. at 655–56 (cleaned up).

    1.    *Eighth Amendment*

"The Eighth Amendment's prohibition on 'cruel and unusual punishments' imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "These include maintaining humane conditions of confinement, including the provision of adequate medical care and, relevant to this case, 'reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Farmer*, 511 U.S. at 832). A prisoner challenging his conditions of confinement "must satisfy a two-part test, consisting of both an objective and subjective inquiry, for liability to attach" under § 1983. *Id.*

"First, the deprivation alleged must be, objectively, sufficiently serious," *Farmer*, 511 U.S. at 834, or "harmful enough to establish a constitutional violation," *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quotation marks omitted). "To be sufficiently serious, the deprivation must be extreme—meaning that it poses a serious or significant physical or emotional injury . . . or a substantial risk of serious harm resulting from exposure to the challenged conditions." *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019) (cleaned up). "In other words, the prisoner must show that the risk [or injury] of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Prison conditions that are "restrictive and even harsh," but that cannot be said to be "cruel and unusual under contemporary standards[,] are not unconstitutional." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "[T]hey are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

Second, the plaintiff must show the defendant-prison "official had a 'sufficiently culpable state of mind,' which, in this context, consists of 'deliberate indifference to inmate health or

9

safety.'" *Raynor*, 817 F.3d at 127–28 (quoting *Farmer*, 511 U.S. at 834). "[D]eliberate indifference is a very high standard," which requires evidence that the "prison official 'knew of and disregarded an excessive risk to inmate health or safety.'" *Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. 837 (brackets omitted)). The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act" knowing that "a substantial risk of serious harm" existed. *Farmer*, 511 U.S. at 842. However, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [the Eighth Amendment] be condemned as the infliction of punishment." *Id.*

\* \*

Figuereo-Mejia identifies various "deprivations" and "harm[s]" that, "[a]ll things considered," he believes were extreme enough to satisfy the Eighth Amendment's objective component:

> Plaintiff has the right to the basic human need to be free from harm, yet in this case Plaintiff was deprived of this right due to a false accusation and [drug] charge . . . . This resulted in him being housed in segregation, losing his good time, the loss of his visits, faced with the threat of being transferred to higher security level prison, as well as strain upon his family which resulted in the loss of custody of his children, . . . and emotional distress and mental anguish which resulted from the entire ordeal. . . . Plaintiff clearly had a right to be free from being thrown into segregation for 38 days for something he was not guilty of.

Compl. 17. Figuereo-Mejia "felt very troubled" being accused of keeping amphetamines in his cell when "in fact [it] was nothing more tha[n] plain coffee." Figuereo-Mejia Aff. ¶ 9. He "was really devastated and stress[ed] out" after Hostetter found him guilty of the infraction because he thought the Commonwealth might criminally charge him and the court would reinstate his 90-year suspended sentence. *Id.* ¶ 14. Figuereo-Mejia's month in isolation "was one of the toughest times [he] ever had to endure in [his] life" because he could not communicate with his mother

10

and children. *Id.* ¶ 17. He still has "anxiety, panic attacks, and depression," which he tries to manage "by practicing meditation exercises" that a prison nurse taught him. *Id.* ¶ 19. He might have to start taking medication. *Id.*

Defendants assert that Figuereo-Mejia's sworn allegations, viewed in his favor, do not show he suffered an "objectively serious" physical or emotional injury, or that he was exposed to a substantial risk of such serious harm, from this prison disciplinary proceeding. Defs.' Br. in Supp. 14. I agree. Figuereo-Mejia's "experience was indeed unfortunate, but his complaints are intrinsic to discipline and administrative segregation." *Terry v. Dep't of Public Safety & Corr. Servs.*, No. 11cv1686, 2012 WL 2564779, at *6 (D. Md. June 29, 2012). No reasonable jury could conclude that Figuereo-Mejia's experience "work[ed] a serious deprivation of a basic human need," *In re Long Term Admin. Segregation*, 174 F.3d 464, 471–72 (4th Cir. 1999), particularly considering all privileges were entirely restored within six months. *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 136–37 (2003) (revoking inmates' in-person visitation privileges for three years, as a sanction for misconduct, did not "create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety"); *In re Long Term Admin. Segregation*, 174 F.3d at 471–72 (holding that the "indefinite duration" of long-term disciplinary segregation, without more, was not an objectively serious injury or risk of harm); *Terry*, 2012 WL 2564779, at *4, *9 (plaintiff found guilty of possessing drugs spent six months in disciplinary segregation, without visitation, before outside lab results showed the substance was coffee); *Westbrook v. Bazzle*, Civ. No. 9:08-3926, 2010 WL 844594, at *1, *5 (D.S.C. 2010) (plaintiff spent one year in administrative segregation before disciplinary conviction was overturned on procedural grounds).

Figuereo-Mejia's emotional injuries—helplessness, depression, anxiety, and isolation—are "unfortunate concomitants of incarceration." *In re Long Term Admin. Segregation*, 174 F.3d at 472. Without more, they do "not rise to the level of the serious or significant physical or emotional injury that must be shown to withstand summary judgment on an Eighth Amendment charge." *Id.* (quotation marks omitted). Moreover, to the extent Figuereo-Mejia asserts he is entitled to relief under § 1983 simply because Defendants' conduct "caused him to be punished" for something that he did not do, *Westbrook*, 2010 WL 844594, at *5; *see* Figuereo-Mejia Aff. ¶¶ 16, 20, the Eighth Amendment does not bestow any such protection in these circumstances. *Cf. Petit v. Addison*, 150 F. App'x 923, 925 (10th Cir. 2005) (non-capital prisoner's actual innocence claim, which had no independent constitutional component, did not state a cognizable claim for habeas relief) (citing *Herrera v. Collins*, 506 U.S. 390 (1993)). Accordingly, Defendants are entitled to summary judgment on this claim.

2. *Due Process Clause*

"The Fourteenth Amendment prohibits the States from 'depriv[ing] any person of life, liberty, or property without due process of law.'" *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145 (4th Cir. 2014) (quoting U.S. Const. amend. XIV). "Due process contains both substantive and procedural components," *id.*, and prisoners retain limited rights to invoke those protections while incarcerated, *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974); *Brown v. Braxton*, 373 F.3d 501, 504–05 (4th Cir. 2004). To proceed on any due-process claim, however, a plaintiff "must first demonstrate that [he was] deprived of 'life, liberty, or property,' by governmental action." *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997); *see Prieto v. Clarke*, 780 F.3d 245, 248, 252 (4th Cir. 2015); *Franklin v. Barry*, 909 F. Supp. 21, 28 (D.D.C. 1995) (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 459–61 (1989)). A protected liberty

interest can arise either "from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or . . . from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). State-created "interests will be generally limited to freedom from restraint [that], while not exceeding the sentence in such an unexpected manner as to" trigger federal due process protection by its own force, "nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "When determining the baseline for atypicality, a court must consider whether the [challenged] conditions are imposed on a prisoner *because of* his conviction and sentence." *Prieto*, 780 F.3d at 253. "[T]he conditions constituting the 'ordinary incidents of prison life'" for the plaintiff, *id.* (quoting *Sandin*, 515 U.S. at 484), 'will differ depending on a particular inmate's conviction and the nature of nonpunitive confinement routinely imposed on inmates serving comparable sentences," *id.* at 254 (quoting *Rezaq v. Nalley*, 677 F.3d 1001, 1012 (10th Cir. 2012)).

Figuereo-Mejia claims liberty interests against being "jailed first, wrongly accused, found guilty, penalized by losing his good time . . . and [contact] visits, put in for a transfer, ha[ving] his security level raised," and spending five weeks in disciplinary segregation—all despite his protestations—based on three officers' testimony that the substance found in his possession initially tested positive for amphetamines.[3] Compl. 21; *see also id.* at 17–22. The Constitution

---

[3] Figuereo-Mejia does not separately challenge the decision to lower his "Good Time [Earning] Level," Compl. 7, which arguably implicated a protected interest, *see Wolff*, 418 U.S. at 556–58 (liberty interest in avoiding withdrawal of state-created good-time credits). *But see West v. Angelone*, 165 F.3d 22 (4th Cir. 1998) (Table) (Virginia "inmates have no protected liberty interest in remaining [at] or being assigned to a particular good conduct [earning] level"); *Mills v. Holmes*, 95 F. Supp. 3d 924, 934 (E.D. Va. 2015) (holding the same). But, that decision was "nullified and the slate wiped clean," *Bullington v. Missouri*, 451 U.S. 430, 442 (1981) (quotation marks omitted), when Woodson overturned Figuereo-Mejia's disciplinary conviction in June 2017. That reversal "constituted part of the . . . process" Figuereo-Mejia received in this case, "and it cured [any] alleged due process violation based on" the underlying proceeding. *Wycoff v. Nichols*, 94 F.3d 1187, 1189 (8th Cir. 1996); *see also Walker v. Danheim*, No.

13

itself guarantees none of these things. *See, e.g.*, *Overton*, 539 U.S. at 132 (no liberty interest in unrestricted family visitation); *Sandin*, 515 U.S. at 485 (no liberty interest in avoiding one month in disciplinary segregation); *Wolff*, 418 U.S. at 556–57 (no liberty interest in good-time credits generally or specific disciplinary procedures); *Freeman v. Rideout*, 808 F.3d 949, 951 (2d Cir. 1986) ("[N]o constitutionally guaranteed immunity from being falsely or wrongly accused of conduct [that] may result in the deprivation of a protected liberty interest."); *Gorbey v. Warden FCI Cumberland*, Civ. No. RDB-19-715, 2019 WL 1493408, at *1–2 (D. Md. Apr. 4, 2019) (no liberty interest in avoiding pre-hearing segregation immediately after positive drug field test); *Terry*, 2012 WL 2564779, at *7 ("[N]o generalized right to a retest in the wake of a disputed [drug] test result." (collecting cases)); *Merriweather v. Reynolds*, 586 F. Supp. 2d 548, 557 (D.S.C. 2008) (no liberty interest in being "housed in a particular institution, at particular custody level, or in a particular portion or unit of a correctional institution" (collecting cases)). "To put a finer point on it," the mere fact that Figuereo-Mejia was "found guilty of a disciplinary charge for which [he was] actually innocent [did] not impose an atypical and significant hardship" on him. *Davis v. Wilson*, Civ. No. 08-589, 2009 WL 688912, at *8 (W.D. Pa. Mar. 12, 2009) (collecting cases).

The Constitution does embrace a "substantive due process" right "not to be deprived of liberty or property based on the *deliberate* use of evidence *fabricated by* or *known to be false* to a law enforcement officer. *White v. Wright*, 150 F. App'x 193, 198 (4th Cir. 2005). Assuming this right extends to the deprivations alleged in this case, *see Prieto*, 780 F.3d at 249; *Richardson v. Ray*, 492 F. App'x 395, 396 (4th Cir. 2012); *Dougherty v. Virginia*, No. 7:14cv66, 2014 WL 3549003, at *6 (W.D. Va. July 17, 2014), Figuereo-Mejia "cannot support his claim with

---

3:16cv257, 2017 WL 4641252, at *2 (S.D. Tex. Oct. 13, 2017) (finding the same); *Long v. Shearin*, 2014 WL 883985, at *5 (D. Md. Mar. 5, 2014) (collecting cases).

14

unsupported allegations and speculation [about] fabrication," *White*, 150 F. App'x at 199. Figuereo-Mejia's speculative theory that Lokey must have lied about field testing the coffee—simply because Lokey did not produce a copy of the actual test and the preliminary results turned out to be wrong, Compl. 3, 7, 13,18–19, 21; Figuereo-Mejia Aff. ¶ 13—is not enough for this claim to survive summary judgment. *See Crawley v. Hinkle*, No. 7:14cv300, 2015 WL 5026158, at *2, *9 (W.D. Va. Aug. 25, 2015).

Of course, Figuereo-Mejia "could still establish a basis for Due Process protection" under state law. *Prieto*, 780 F.3d at 252. "To do so, he would need to point to a Virginia law or policy providing him with an expectation of avoiding the [challenged] conditions of his confinement *and* demonstrate that those conditions are [significantly] harsh and atypical in relation to the ordinary incidents of prison life." *Id.* Figuereo-Mejia did mention a Virginia Department of Corrections policy "indicat[ing]" he should not have been charged with drug possession or put into administrative segregation "until [after] the lab results came back," Compl. 18, but he did not produce any evidence supporting his position, *see Gorbey*, 2019 WL 1493408, at *1–2. "Moreover, prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation." *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013). Figuereo-Mejia cannot make that showing because the punitive conditions described in his affidavit, accepted as true and viewed in his favor, all "appear to be fairly common," *Beverati*, 120 F.3d at 503, incidents of life for someone serving a lengthy prison term, Figuereo-Mejia Aff. ¶ 14. *See Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991).

Because Figuereo-Mejia "cannot establish a protected liberty interest" on this record, I "need not consider the sufficiency-of-process" component of his Fourteenth Amendment claim.

15

*Prieto*, 780 F.3d at 248. Having reviewed the full record in his favor, however, I am convinced no reasonable jury could "find that [Figuereo-Mejia's] due process rights were violated because he was sanctioned on the basis of a flawed [field] drug test, the results of which he disputed, and for which he was ultimately vindicated." *Terry*, 2012 WL 2564779, at *8. "[T]here is simply no constitutional guarantee that all executive decision making must comply with standards that assure error-free determinations." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Accordingly, Defendants are entitled to summary judgment on this claim.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment, ECF No. 21, will be granted in part and judgment entered in the individual Defendants' favor. Figuereo-Mejia's claim for retrospective injunctive relief against Defendant Lokey in his official capacity will be dismissed without prejudice. A separate Order shall enter.

ENTER: September 30, 2019

Joel C. Hoppe
U.S. Magistrate Judge